We have two oral arguments this morning. The first one is combined. Mr. Chu, how long do you want for your argument? Ten minutes. Okay, so it's ten and ten. Correct. Thank you. Okay. Go ahead. You can proceed. Good morning. Morgan Chu on behalf of the Appellant Softview. May it please the Court, the Board in construing a particular claim phrase was in error on a key claim limitation. And if you'll bear with me for a few minutes, I think I'll be able to show that first. I need to interrupt you before I start bearing with you. I'm sorry about that. Is it your position that the preserving limitation has the same meaning across all the claims at issue, in particular across the two patents? Yes. Okay. I think I noticed, and tell me if I'm wrong, that there is a sentence in the abstract of the 353, a sentence in the written description of the 353, which your briefs rely pretty heavily on, neither of which – about look and feel and desktop computer – neither of which appears in the 926. Is that right? I believe that is correct. So I guess I'm puzzled about how that came to be. And in particular, how is it that both parties said nothing to us to explain a potentially important disparity between the patents? Well, first of all, I think both parties agree that whatever the meaning is of the claim phrase, it is the same for all claims for both patents. Well, can you – how did these passages come to appear in one but not the other? And that language was added to 353. It was not added to 926. So the Court's very observant on that difference, but I think both sides agree that it doesn't make any difference in terms of the fact that whatever the construction is, it ought to be the same for both patents. Okay. Thank you. Now, I've – In the blue brief at 79 and 80, you argue there was a long-felt need for the invention when you cite data from a 2007 study regarding consumer demand. Kaya Serra has asserted the effective filing date of the 353 is June 12, 2000. So how does long-felt need in 2007 satisfied by an invention with an effective filing date in 2000? I think that a survey after the invention date that shows there's still a long-felt need would be consistent with there being a long-felt need at an earlier date. The invention had not been widely disseminated. Could I ask permission from the Court to have distributed a few pages from the joint appendix and the intrinsic evidence that I would like to address? It's been distributed to opposing counsel. Would you speak – Objection. No objection. Go ahead. These are already in the joint appendix? Yes. It's plain language. Instead of flipping through multiple volumes, I thought it would be easier to have the particular pages. So if I can jump to what the problem is – These are highlighted, just to make it clear. Yes, they are. Did they see the highlighted copies? Yes. They have identical copies. All right. So 15 years ago, in the year 2000, here's what the problem was. Someone would have a desktop computer, and they would access the webpage, and there would be a certain look and feel, including the layout. It might be – let's say it's the Washington Post, and let's suppose the layout was four or five columns, three images on it, the functionality. Functionality is very important. When you go to Google, there's a search box. You type something in. You go to Amazon.com. You want to buy something, you have to type in your credit card. That's part of functionality and design. And the problem was the user of a handheld device, such as PalmPilot, which was very popular at the time, could not access the internet and get a webpage and interact with it with the same look and feel, including the same layout, functionality, and design. That's the problem that was solved. What's the fight about on the preserving the original page limitation? We say that it is preserving the original page to preserve that look and feel that one would get from the conventional desktop browser. The other side and the board says, in essence, well, what about a webpage that has never been displayed on a desktop? Somebody created the webpage on their iPad or maybe even on their Android device, and it's sitting in a server somewhere. At that point, the reference to a conventional desktop seems extraneous. That is, it seems like what's to be preserved is whatever the HTML code sitting in the server instructs about display and capabilities. And as long as those instructions are followed, that's as much as the claims call for preserving. In the real world, that webpage that's never been browsed, if true, was designed by a webpage designer. Well, first of all, in the real world, I think the webpage designer would say, before I release this, I'm going to use Internet Explorer and Mosaic and several others to see what it actually looks like. But let's suppose we've got a lunatic webpage designer and never done it. I mean, plausibly, I assume it's somebody sitting in a cafe with their iPad and making up webpages. That's not a desktop. Okay. But that designer has in mind the way it's going to look and, in particular, what the layout will be, the functionality, as well as the design. But that's not tied to a desktop view. The webpage designer in the year 2000, since people viewed the webpages from their desktop, would have in mind the way it would be viewed in a desktop browser. So, if I can describe what I think the board's interpretation is, they're saying it has to maintain whatever is translated on the handheld device the first time it's rendered on the handheld device. And literally, what the board's definition means of this preserving limitation is that, for example, if you have that four-column newspaper page, three photographs, and the like, suppose columns are stripped out, centering is stripped out, bold titles are stripped out, the photographs are stripped out, some simple crazy fonts used, and it's all crushed. So that I understand this. It seems to me there are two possible non-desktop things that can be preserved. One is what I think you just said, which is the way the thing looks at the mobile devices, the completion of the mobile devices step one. Pre-rendering, I don't know if that's the correct term. The other is what I was referring to before, whatever instructions are in the web servers file about display. What is it about the board opinion that tells us that, as I think you suggested, it was that former thing, namely what has to be preserved upon fiddling with scale, magnification, is not simply the instructions in the server, but the look, the representation after step one, the pre-magnification on the mobile device. So what the board's definition is, and I'm going to just excerpt some of the language, is to maintain whatever is translated. And the only way to read that is it's to mean whatever is rendered first on the screen is maintained. And if one looks at the claim language in the first page of this material, it has an exemplary 353 claim one. And if you look at the first block that's highlighted in yellow, it refers to rendering a browser interface via which a user is enabled to request access to an original web page. And in that block of claim language, original is used four times. So it's clear that that's the original web page that's created by the web page designer. What else could it be? It hasn't been rendered on the handheld device yet. Indeed, at about line 33, it then says retrieving the web page. So it's retrieving that original web page. And what is it retrieving? We see in the material above an original page layout functionality and design. And after retrieving the web page, we see in this new block at about line 38, quote, preserves the original page layout functionality and design of the content defined by its original format. The board's construction completely erases the word original, even though it appears seven times in the claim language that I've referred to. An original in the claim language must refer to what the web page designer designed. So let's go now to the written description, which is on the second page under the title Brief Summary of the Invention. And we see there, starting at about line 49 of column 2. And this is, again, the 353, but what you're about to rely on would not, in fact, appear in the 926. Correct. The methods and software enable users of various devices, from handheld devices with small screens, to view and interact with web pages in a manner independent of the screen resolution of such devices built in or associated display, while maintaining the look and feel of browsing such pages with a conventional desktop browser. That's a fairly clear statement about what the invention is. It's not maintaining whatever comes up, no matter how curious or distant it is from the original web page as viewed on a conventional desktop browser. Now if we go to the third and fourth pages of the materials, this is from the prosecution history. And on page A, 1119, I've highlighted in rose color, I think, what is cited by the petitioners and was cited by the board. And the petitioners in page 28, I believe, of their brief say, this defines the claim language. That rose highlighted language is hardly a definition. Can I come back and try to ask in a better way the question that I think it was my second to last question. Tell me why I would be wrong, based on the board's opinion, in saying it actually did adopt the claim construction that said, what needs to be preserved is the set of display and capability instructions in the original web page, or rather, in that portion of it, which is translated. Not in the post-translation version of it. That's how I read page, I guess, 13 of the board decision. Numbers are all over the place. The original page 13. So tell me why that's wrong. One would read the board's discussion and its claim construction to mean only a small portion might be translated. And one might not preserve. Some of the claims do say that, that only a small portion are translated. Let me come to that issue in a moment. But the heart of this claim, and the claims in general, talk about preserving the layout functionality and design. They don't talk about preserving, with one exception, just part of the layout functionality and design. And here's what the board did to import that to all of the claims. They went to one claim, claim 30 in the 926 patent. And that claim says, in essence, preserving at least a portion of the layout functionality and design. So that's very clear that you could just preserve 20% of layout functionality and design. I guess I'm failing to understand how, if you've only translated 20%, you could possibly be preserving, because you haven't even done anything to the other 80%. Okay, I have to back up. Why is this just not essentially a tautology? Whatever you've taken, you've got to preserve the features of that piece. I should have backed up just a little bit. What is the HTML code? In addition to layout functionality and design, which is what the user sees, there's stuff the user doesn't see that's part of the HTML code. What's the stuff that the user doesn't see and interact with? It's metatags, as an example. The metatag might be the title of the document, or it might say it's a newspaper, the name of the author. Things that bots might pick up in searching, things that are buried in the code. And they may be very important for other reasons, but not important for the look and feel. There are also comments. They're put there by the HTML programmers. That has nothing, neither the comments nor the metatags, have anything to do. It is true that those things are not being translated, or may not be translated. And it's very clear in parsing through the claim language that the claim drafters didn't want a situation where someone said, I'm just not going to translate the comments, and therefore I won't infringe this claim. But what needs to be preserved from the original page is the layout, functionality, and design. And indeed, Claim 30 of 926 patent even makes it clearer because that's the one claim, the one independent claim, that says you only have to preserve a portion of layout, functionality, and design. So the board's error was to take that claim, Claim 30 of 926, and stand claim differentiation on its head. It took that limitation and imported it to all the other claims where that concept of preserving only part of layout, functionality, and design doesn't appear. Can you give me an example in the portion of the board's decision having adopted its claim construction, it then goes through the prior art and says, we find this, we find that, we find this other thing, where the difference between your view of what the correct claim construction is and what you say the board did makes a difference in how the board treated a piece of prior art. Oh, at a very high level, no piece of prior art has preserving as properly construed. You're under two minutes, by the way, Mr. Chief. And may I reserve time? Thank you. Good morning, Your Honor. Eric Cohen, representing Kiyosera. I'm splitting the argument with Mr. Alemani, representing Motorola. I'm going to argue the claim construction preserves limitation and the obviousness of the preserves limitation. I'll answer any questions you may have about due process, but we're really leaving that to the patent office solicitor. Mr. Alemani is going to argue the so-called smart zooming and the secondary considerations. If I may, again, I think where Judge Toronto left off, we think it really doesn't matter whether you affirm the board's construction, which we think should, or whether – What is the board's construction? The board's construction is – Let me just state how I understand the issue in my mind. One is whether the version that is adopted by the mobile device, once it's done, translated into the scalable vector representation, which allows magnification without changing things, what is preserved is the difference between – it's something that preexisted the arrival of the thing on the mobile device, namely the display features provided for in the instructions in the page sitting in the server, or whether it's preserving some version after the first step in the mobile device, whatever that's called. Let me give you a fairly detailed answer to that. The patent shows, and it's on one of the pages in the patent, it gives an example of HTML code. That's what's sitting on the server. It's HTML code. If you browse and go to any webpage, there's a way you can see what the actual code is, even today. You've got HTML code on the webpage. Actually, what comes up on your screen is probably from more than one place, more than one server. That code, even in the prior art, had to get processed by a browser before there was a layout. The patent describes, and this is in the prior art, the browser looks for objects, defines each object by putting a bounding box around it. So if there's some text, it'll put a bounding box around it. The code prescribes a general layout, but it doesn't prescribe exactly. It just gives relationships. That has to be processed by the browser's rendering engine. As they explain so eloquently in the prosecution history, there really isn't a layout in design until after it's been processed by the rendering engine. And each browser does it somewhat differently. So the boards construct. Now, the other thing, the claim says... I think I'm hearing you say that what has to be preserved is the post-rendering set of display features. That's exactly what they said. Those features that come from whatever code has been processed or translated. And at least half the claims say translating at least a portion of the HTML-based content from its original format. So that means, it clearly says we're not necessarily translating all HTML. And from that, the board concluded that it can't be as viewed on a conventional desktop browser because how do we know what's been translated? And that comes from the translating part of the claim. So, to answer one other question, Judge Serrano, you asked, how did the difference in abstracts and summaries of the invention come to be? Well, after this patent application was filed in the year 2000, after the inventor and his patent attorney learned about the iPhone, about six months afterwards in June of 2007, they amended the abstract and they amended the specification to put in the language that counsels were relying on to support their claim construction. It was a clear attempt, after the fact attempt, to cover the iPhone. This is a submarine patent. There's no question about it. How does that bear on the obviousness question? That's an answer to your question, Your Honor. But it actually doesn't have any bearing on the obviousness question. It conceivably would have a bearing if there were a written description issue. We cannot raise that in this particular proceeding, Your Honor. But going to the issue about does it matter, really. And you agree that these passages in the 353 abstract and the 353 written description that don't appear in the 926 are nevertheless properly considered in interpreting the 926? I would agree that since we all agreed you can consider that these claim terms should be considered the same for all the patents, I would agree that they could be considered. We think they don't matter. We think they don't matter because of the explanation that the inventors gave in the prosecution history. And why is that important? And why is that a definition? The part that he highlighted in rose, as if we're looking at it through rose-colored glasses. Well, if you read the entire remarks section, they use that same introductory language on page A1104. But before then, on pages 1094 and 1095, the issue was they had tried to claim this limitation using the word substantially. And the examiner kept rejecting it. The examiner said, it's indefinite. I'm not going to give you any claim with the word substantially in it. So they amended this particular limitation and a whole bunch of other ones. They yanked out the word substantially and put in other things. On pages 1094 and 1095, they said, as far as we're concerned, the claims have the same scope even though we amended them. So there's no festo estoppel. And they went on to say, we're going to explain this so that one skilled in the art knows what the scope is. And then on pages 1099, 1100, 1102, and then on 1119, they used the same language, the scope of, to introduce their definition of each and every term from which they removed the word substantially to avoid an estoppel from their amendment. And so the scope of, they used that language, the scope of, to describe the definition on page 1119. They follow it on 1120 to say, this preserves limitation as in a bunch of other claims. And they all have the same meaning as the meaning we gave in the preceding page. And then they use the same language in the prosecution history of the 926 patent. And this is on page A8167 and 68. The exact same explanation in ipsis verbis. So the language, the words, the scope of, that's definitional. And they're basically saying, you've got to, this, what we mean, and so let's look at the claim language itself. The claim language says, so the context of preserving is preserving dot, dot, dot, when scaled and rendered. That's in the translating claims. So you're preserving when you're scaling and rendering, when you're zooming in and zooming out of preserve. The processing claims, one version preserving as interpreted by a rendering engine. The other processing claim, preserving at each zoom level and view. The claim language itself supports the board's construction. The prosecution history supports the board's construction. But does it matter? If you look at, I think it's in our brief on page 39, we reproduced page A2767 and A2769. Ben Bederson's homepage. Ben Bederson is the author of the Pat++ articles. Ben Bederson did a browser and he showed, you could zoom in and out on his homepage and it would preserve the original page layout functionality and design. Their argument is, well, how do we know that Bederson's browser didn't process all the HTML code? Well, the heading is centered. There's nothing that's apparently missing from that page. They haven't offered any evidence that anything is missing from that page. Pat++ was a desktop browser. Was it conventional? What's conventional? That's what he said in the Supreme Court. Thank you, Your Honor. But to finish here, there's no evidence. Even under their construction. Let me put it possibly. Even under their construction, Pat++ preserves Ben Bederson's homepage when it's zoomed in and zoomed out. There's no evidence that anything wasn't processed. Good morning. May it please the Court. The Board analyzed the patents on the one hand, Pat++ on the other hand. In relation to smart zooming, they found that they both lay out the page using the conventional process, that is by using bounding boxes. They both zoom based on bounding boxes. In relation to smart zooming, they do precisely the same thing. These findings are based on substantial evidence, and the Board's finding that these claims are invalid as obvious should be affirmed. I'll first walk you through the process that the Board took to analyze the patents. They looked at the disclosure at A870, which is in column 20, and they found a short description of the way in which the patent describes tapping to zoom, the smart zooming claims, as the file calls them. And they determined that there was very little description there. So they went back to the patent. They looked at the only embodiment in the patent that describes laying out a page and zooming in and out of the page. And that's all done in relation to Figure 5, which is A853. Again, it's a conventional process. The browser goes through, parses the page, determines what objects are on the page, including graphic images, columns, text, et cetera, puts those into bounding boxes, and sets up the layout of the page. Then there's a later description in the patent, around columns 19 and 20, where it describes how zooming occurs. And as the Board found based on that evidence, it uses a bounding box to zoom. The Board then turns its attention to PAD++, which describes exactly the same process. They relied specifically on a section at A2504, which is a center command. Center command specifically says that it operates on a bounding box to center that content that's contained within the bounding box so that it fills the screen. Appellant argues that, well, you know, in spite of all this disclosure in PAD++, all the references, there's a programmer's reference guide, there's sample applications, in spite of all of this, because the software that their expert downloaded that was a proof of concept that the Board found of that software, because it didn't support each and every tag that was existent at the time it was created, that somehow that doesn't show that PAD++ would preserve. The Board found, however, though, based on substantial evidence, that it would have been well within one's skill and the art to extend the browser. If they're building a browser, they wouldn't build a third browser. Rather, they would extend it to include all HTML tags. And that finally is at A26. And the Board's relying on all the record. HTML was well known. Browsers were well known. So there's nothing in the record that suggests that wouldn't be within the skill of the art. The Board went on to find that it would have been obvious to combine Zorris and PAD++. They relied specifically on two sections of the PAD++ references, A2635 and 2821. Both those sections explicitly say, you can take these teachings, you can take this program's reference, you can take all the things I've described and apply them to a PDA. Also, like the patent, he says you can apply them to other things. For example, a desktop is in the proof of concept that he built, but you can apply them to a PDA, and he explicitly says that. In the Board's institution decision, they relied on additional evidence. And that evidence included the first declaration of Jack Grimes at A199 for the first institution decision, A618 for the second institution. They explicitly referred to Dr. Grimes' declaration at paragraphs 103 and 109, concerning the fact that you could combine these references together because they were all related. They were all in the same field in the field of Zooming generally. And that makes sense in the context of the patent, because the patent itself says that the teachings could be applied to a desktop, they could be applied to billboards, they could be applied to small screen devices. There is an argument that Appellant makes that there is a claim construction, a requirement to construe the claims that are related to Smart Zooming. This is at page 27 of the reply. That argument's waived. It was never raised below or in the opening briefs. But in spite of that, those claims should be construed at least broadly enough to encompass the embodiment that's described in the patent, which is the embodiment I described. Taking the page, laying it out based on bounding boxes, and then performing Zooming based on those bounding boxes. So we don't believe it needs to be construed. No one raised that issue before the reply brief on page 27. The board was able to analyze the claims and the prior art in light of the Plain and Ordinary Meeting. There's a heavy presumption that the Plain and Ordinary Meeting should apply, so we believe that that was proper. There is a statement in the opening brief and the reply brief, pages 69 and 30, that refers specifically to A8801, paragraph 75 of Dr. Ryman's declaration. And in that section that he quotes, that the briefs rely on, he takes a statement out of PAD++, and in the statement he omits the beginning, he omits the middle, and he omits the end. And he picks two segments out of that long statement to say that PAD++ is only concerned with zooming in and out of an object as a whole, zooming in and out of an HTML page as a whole. We believe if you look at that entire quote, it actually supports our position. It talks about the fact that a compound object, such as HTML, can be composed of many simple objects, such as characters, line segments, and images. So images, one of the exact things we're talking about in the claims is being able to zoom in and out of. PAD++ specifically discloses that. And at A2653, PAD++ explains that things like the compound document, like an HTML document, are actually stored in a hierarchy. So... Mr. Alimony? Yes. You both did the red briefs together, so there's a discussion, an argument in there that there's waiver. And the reply to it was just summaries, three lines or something. Would you discuss that a little bit? The waiver on which issue, Your Honor? Hang on just a second. Only claim 30 of the 96 patent recites, preserves at least a portion of the HTML content. But this argument was waived because it was not presented to the board. Okay. It's 22 and 23 in your red brief. Okay. Yeah. I think our point there in relation to these claims is that we treated the claims all as being the same. We treated the preserving limitations being the same. So there was no argument in the proceedings below that any of the claims should be treated differently, that the scope of the claim should vary. Some of the claims talk about translating a portion. Some of the claims talk about translating a view. In other words, a small... Again, it's another way of saying a small portion of the screen. Based on the board's finding that one skill in the art could extend, something like Pad++ would understand all the HTML, I think implicit in that is the fact that one wouldn't create an absurd browser. So the record below is that we simply treated the claims all as the same and that that language was all the same. So the attempt in the opening brief to try to slice and dice the claims based on various limitations we held was waived. But we still discussed those limitations. We discussed them today. We discussed them in our brief. So I still believe the appropriate construction treats that preserve limitation the same throughout the claims. I want to make mention the board considered all the secondary considerations. They did so explicitly. At pages 831 and 867, they set up the entire portion of Sophie's secondary considerations and they considered each of them. They relied on substantial evidence in finding that those secondary considerations had no nexus to the claimed invention. We believe those findings are proper and they're supported by substantial evidence. Unless there are any further questions, I'll sit down. Go ahead. Great. Thank you. Your Honor, may it please the court. Because Sophie has not realleged its various procedural challenges to the board's management of this proceeding, I should be able to keep this argument short. The principal challenge brought by Sophie to the board's decisions regarding this proceeding concerns the reply that Kiyosara filed during the course of this inter-parties review. The relevant standard for the propriety of that reply is that provided by section 42.23 of the patent regulations, which limits that petitioner's reply to responding to arguments raised in the proceeding patent in response. Can I ask this? I took it that Sophie's argument here about the procedure is only a constitutional argument, is not an argument about whether the regulations or statute for that matter were complied with, in which case the standard is not the regulation, but simply whether due process was violated by not giving them the last word on evidence. In its opening brief, Sophie also argued that the new grounds rule or its equivalent should apply in these proceedings. The patent office- Not part of their statement of the issue or in their heading, which is pure due process. The issue was alleged in their brief. The office responded to it. With regard to the new grounds issue, whether that rule applies in this case, I'd note that at page 33, note five of their reply brief, Sophie concedes that the new grounds rule does not apply in these proceedings. It's a creature of part 41 of the patent regulations, which only governs examination and reexamination proceedings, and that rule serves needs that are unique to an examinational type proceeding. Again, the relevant rule here, there's no new grounds rule in part 42, which governs these proceedings. The relevant rule is 42.23. And in its reply brief, Sophie did not respond to the office's argument that the proceeding patent owner response did raise the arguments about the motivation to combine the Zaras and Hara references. So we take that as effectively conceded. I'd note that in his reply brief, Sophie, this is at about pages 35, 36, did allege two additional arguments that were supposedly new, and that petitioner's reply, these concern the Zaras and Pad++  The arguments concerning these references, though, were never raised in Sophie's opening briefs and haven't been raised in this oral argument. And so I won't address them here. The argument is certainly waived. And then with regard to the point concerning due process, in its reply brief, Sophie refines its argument by citing two decisions from the 10th circuit, the Dobley and Beard cases. This is about page 39, 40 of its brief.  Schultes from the 10th circuit, and other circuits that hold that whether evidence may be introduced in rebuttal in a trial is a matter within the discretion of the trial judge. The Dobley and Beard cases cited by Sophie in its reply state that in summary judgment proceedings, the summary judgment movement actually cannot introduce a rebuttal evidence. I'd note, though, that both of these cases are from the 10th circuit, the same circuit that the patent office cites. The distinction between these cases is the rule that Dobley and Beard imposes unique to summary judgment proceedings, which have special rules that limit the movement's rights because it's recognized that it's an abbreviation of the normal right to present evidence. And in particular, rule 56 includes rule 56C, which imposes a 10-day limit on when a hearing can be held after there's a motion for summary judgment. Some courts of appeals have interpreted that 10-day limit as also barring the introduction of rebuttal evidence in these proceedings. This rule isn't even universal among circuits, but it is clear from a close reading of these cases that the rule is unique to summary judgment, and in particular to rule 56C and its 10-day limit. It's not a general due process limit. The general due process limit is that articulated by the same circuit, the 10th circuit, in cases such as Tanberg and by other circuits that, again, is within the discretion of the trial judge, whether to allow evidence to be introduced on rebuttal. What, though, are the due process constraints on the discretion? Basic fairness and is there some kind of unfair surprise? And we believe that's preserved by the regulation governing here, 42.23, which limits the petitioner to responding only to those arguments raised in the preceding patent owner response. So in your view, the due process argument is answered by the finding of the board that there wasn't anything substantially new. Yes, Your Honor. In the brief. Our position is that a petitioner's reply that complies with 42.23 would also satisfy the demands of due process in these proceedings. And as a final argument, I'd urge this court to simply consider the practical considerations of the approach to these replies and whether they're admissible. That's Softview urge in its initial brief. Softview urges this petition that any argument or evidence introduced in a reply is improper. If the petitioner could have anticipated, could have expected that the patent owner would make that argument in reply, and if it was possible to anticipate that that argument would be made by the patent owner, the petitioner has to respond to it in its initial petition and can't save that reply for what the statute designates as the reply. As a practical matter, this kind of inquiry would effectively expand the record in these proceedings for one thing to include the thousands of pages of the record and the usually co-pending district court litigation. This court would then be required to review all of that record, determine whether the interactions between the patent owner and the petitioner in any way apprised the petitioner of any argument that the patent owner might make. The director would submit that this kind of through the looking glass inquiry into what could the petitioner have known and when could he have known it would be unmanageable on this court's appellate review and is utterly divorced from the clear congressional purpose behind these proceedings to create a fast, efficient and fair mechanism for adjudicating the validity of issued patents. The alternative approach that urged by section 42.23 simply requires when assessing the propriety of that petitioner's reply, this court to consider did it respond to arguments in the preceding patent owner response. This simple and compact inquiry would then allow this court to focus its main energy in appellate review of these proceedings on the principal question. Does the evidence of record support the board's finding with regard to the patentability or unpatentability of the claims? If this court has no further questions, I yield the floor. Go ahead. In my two minutes, I want to address the smart zooming claims and then I want to return to some of the questions we were discussing earlier. So first, what is a smart zooming claim? An example is three photographs, four columns. The user of the handheld device wants to see one photo, small display, taps on it, zoom to that exact photo and it's fit across the display just from the tapping. That's claim 40 of 926. Claim 41, same thing with the column. Tap on the column, column four, now the user sees column four, top of the column and can scroll down. Not a single piece of prior art had smart zooming before this invention. Now let me return to what is in part a theoretical but a very real discussion that we had a little bit earlier. One can theoretically think of the HTML code as just code sitting out there and not having an original web page layout functionality and design. But someone can also say, no, it really does have a layout functionality and design. And the claim is written that the web page writer, is this wrong, that the web page writer is among other things, trying to write into what he leaves when he's done instructions about what this thing is supposed to look like within some range. Yes. So how could that code not have some layout information in it? Not only layout information, it has layout functionality and design information. And my point here is using claim one of 353 as an example, that first block of highlighted text shows that the claim drafter had in mind before there is requested access to that web page on the internet, an original web page. That's what that block of text is. Later in the claim, the second highlighted block then goes on to say, translate that portion of the HTML code that will preserve the original page layout functionality and design. State it slightly differently. You've got to translate at least the HTML code that will preserve and render on a display, because this is after the word rendering, render on a display the original pages, layout functionality and design. Your Honor asked a question earlier about how this. Wrap up. Yes. About how this applies to prior art. So let me give you just one example. And the one example is pad plus plus. And if one looks at page 54 of our opening brief, there is from the actual prosecution history, the dumbed down Yahoo page. This is the page that would actually be rendered by pad plus plus. And the board believes that this page, which doesn't have the layout, doesn't have the functionality, no search box and doesn't have the design. It has none of the three elements. That this renders somehow obvious a claim that requires preserving the original layout functionality and design. I believe in short that the natural reading of the claim language, as well as aligning the written description is consistent with, and I believe is the claim construction that Sophie put forward as consistent with the claim language, the prosecution history, as well as the written description. Thank you.